UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ORRIN BACOTE,                                            :

               Plaintiff,                   :

                                        :                   16 Civ. 1599 (GHW) (AJP)

           -against-                   :

                                          :                   **OPINION & ORDER**

RIVERBAY CORPORATION, et al.,                            :

               Defendants.                 :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Magistrate Judge.**

           Presently before the Court is defendants' motion to disqualify plaintiff Orrin Bacote's attorney, Gerald Cohen, and/or to exclude any evidence relating to the taped phone call between Cohen and defendant Lamont Leath.  (Dkt. No. 84.)  For the reasons set forth below, defendants' motion is <u>DENIED</u> in its entirety.

## FACTS

           Defendant Riverbay Corporation operates Co-op City in the Bronx and hires "'Special Patrolmen'" to provide on-site security.  (Dkt. No. 45: 3d Am. Compl. ¶ 7.)  Bacote alleges that he was assaulted and unlawfully arrested by the Co-op City defendant patrolmen on February 1, 2015.  (3d Am. Compl. ¶¶ 12-18.)  On March 2, 2016, Cohen filed this 42 U.S.C. § 1983 action on Bacote's behalf seeking damages for Bacote's alleged beating by the defendant officers.  (<u>See generally</u> Dkt. No. 1.)  On October 3, 2016, Riverbay's counsel first identified Lamont Leath, a Riverbay patrolman at the scene of Bacote's assault, as someone "involved in the subject incident."  (Dkt. No. 115: Cohen Aff. ¶ 2; Dkt. No. 116: Cohen Aff. Ex. O at 1.)  A subsequent deposition of another defendant led Cohen to believe that Leath may have assaulted Bacote along with other officers while Bacote

was handcuffed in a van.  (Dkt. No. 100: 10/20/16 Conf. Tr. at 23-25; Cohen Aff. ¶¶ 4-6.)

When Cohen informed Riverbay's counsel, Horace Rhoden, that he intended to add Leath as a defendant, Rhoden stated that Leath no longer worked for Riverbay.  (Cohen Aff. ¶ 7.) At an October 20, 2016 court conference the day before Leath was added as a defendant, Rhoden stated that he was not prepared to accept service on Leath's behalf.  (10/20/16 Conf. Tr. at 26; see also Cohen Aff. ¶¶ 7-8.)  Cohen posed the following question to Rhoden at the conference:

> MR. COHEN: . . . .  I'd like to know, is Riverbay not going to represent Officer Leath even though he's no longer working there?
>
> MR. RHODEN: I cannot make that decision.  That decision is not up to me.  If I was to take a guess, I mean, I would believe we would be also asked to represent him as well.  That would be my guess, but that's a decision that I cannot make.  I do not make that decision.

(10/20/16 Conf. Tr. at 27.)  Leath was added in Bacote's Third Amended Complaint filed the next day, October 21, 2016.  (See 3d Am. Compl.)

Leath received the summons and Third Amended Complaint on November 15, 2016. (Dkt. No. 85-15: 12/7/16 Leath Aff. ¶ 2.)  Leath states: "When I received the summons and complaint I was no longer working for Riverbay Corporation.  Therefore, I did not know that I was entitled to representation by an attorney at the expense of Riverbay Corporation."  (Id.)  Defendants state that because Leath was a Riverbay employee at the time of Bacote's assault, "Leath was entitled to representation through Riverbay Corporation free of charge" through Co-op City's union agreement.  (Dkt. No. 86: Def. Br. at 4.)

According to Leath, Bacote contacted him and apologized, claiming he knew Leath "had done nothing to him."  (12/7/16 Leath Aff. ¶ 3; see also Dkt. No. 85: Corchia Aff. Ex. M: Leath Dep. at 62-63.)  Leath and Bacote knew each other from the Co-op City neighborhood, and both worked as corrections officers during the same time period.  (Leath Dep. at 46-47, 56-57.)  Bacote

gave Leath the telephone "number to his attorneys and told [Leath] to [be] removed from the case."  (12/7/16 Leath Aff. ¶ 3; <u>see also</u> Leath Dep. at 62-63.)

Leath and Cohen spoke "on three separate occasions."  (12/7/16 Leath Aff. ¶ 4.) Cohen informed Leath that he "was entitled to have an attorney in this case" (<u>id.</u>), although "at no time did Mr. Cohen advise [Leath] or recommend that [he] consult with counsel before speaking to Mr. Cohen about the" case (Dkt. No. 85-16: 1/12/17 Leath Aff. ¶ 2).  According to Leath, Cohen "promise[d]" Leath that "he would dismiss the action" against him if he spoke to Cohen about Bacote's assault.  (12/7/16 Leath Aff. ¶ 6; <u>see also</u> Leath Dep. at 63-64, 69.)  "Because of this promise, and the fact that [Leath] did not know that [he] was entitled to an attorney paid for by Riverbay Corporation, [Leath] went ahead and spoke to [Cohen] concerning the events."  (12/7/16 Leath Aff. ¶ 6.)

According to Cohen, however, "[o]n or about November 17, 2016, Mr. Leath contacted my office requesting to speak with me about the lawsuit, indicating that we would dismiss the case against him once we heard what he had to say."  (Cohen Aff. ¶ 13.)  Cohen told Leath that he "could not speak with him unless he confirmed in writing that he was unrepresented and that he clearly understood [Cohen's] role as plaintiff's counsel."  (Cohen Aff. ¶ 15.)  Cohen states:

> 16.  During that conversation, I had no substantive discussions about the incident. Further, I did not make any promises to Mr. Leath, nor did I indicate in any way that the case against him would be dismissed in exchange for a statement.
>
> 17.  On the contrary, Mr. Leath was eager to speak with me because he was convinced that the case would be dismissed against him once I heard what he had to say.
>
> 18.  In light of this, I explained to Mr. Leath that <u>if</u> he committed no wrong against Mr. Bacote, or the facts did not support a claim against him, plaintiff would certainly dismiss the case against him.
> . . . .

26.  At no time during <u>any</u> of my communications with Mr. Leath did I ever tell him that I would dismiss the case against him in exchange for his statement.

(Cohen Aff. ¶¶ 16-18, 26.)

Cohen sent Leath the following email prior to their discussion:

Dear Mr. Leath,

I am writing to you because you recently contacted me after we served the complaint in the above-referenced case against you.  As I mentioned on the phone during our brief conversation, I represent Orrin Bacote, the plaintiff, in this matter and you are now (at least for the time being) one of the defendants in this action.  As such, our interests are directly adverse and I cannot speak to you if you are represented by an attorney.  I understand from your communications with my office that you are not represented by an attorney and have no intention of engaging one.  In fact you told my associate, Ilyssa Fuchs, you plan on moving pro se.  If this is the case we can speak, but I feel compelled to inform you that I am only looking out for the best interest of my client, Orrin Bacote.  If you still wish to speak to me after being informed of this, please write back to this email confirming you fully understand what I have told you and then we can speak.  Thank you.

(12/7/16 Leath Aff. Ex. 1: 11/17/16 Emails; <u>see</u> Cohen Aff. ¶ 19.)  Leath responded:

Mr. Cohen,

I do understand as you've explained on the phone that you are representing Mr. Bacote the plaintiff, in this matter and that [h]e is your sole interest[.]  In addition as I see no need for representation at this time as I expect to be removed from this action, I've agreed to speak freely with you as I have caused no harm to your client and he has acknowledged as such.

(12/7/16 Leath Aff. Ex. 1: 11/17/16 Emails; <u>see</u> Cohen Aff. ¶ 20.)  The same day, November 17, 2016, Leath called Cohen, who recorded the conversation without informing Leath.  (Cohen Aff. ¶ 21; Corchia Aff. Ex. K: 12/7/16 Emails.)  Cohen "reviewed several of the ethical decisions regarding the propriety of undisclosed recording of witnesses" beforehand and believed that he was permitted to record his discussion with Leath.  (Cohen Aff. ¶ 22.)

Leath told Cohen that on the day of the alleged assault, he witnessed multiple officers

attempting to subdue Bacote on the ground.  (Cohen Aff. Ex. M: 11/17/16 Telcon. Tr. at 2.)[1/]  Leath

intervened and took hold of Bacote's arm:

> [LEATH]: . . . .  I back up towards him and I go to try and to step on the handcuff where his hand is still moving back and forth.  I step on the handcuff.  And then I get down on one knee and that means I have one arm.
>
> [COHEN]:  Okay.
>
> [LEATH]:  That's when I start telling people "I got his arm.  Get off him.  Get off him."
> . . . .
>
> [COHEN]:  Well what were they doing?  They were just–they were just throwing kicks and punches?
>
> [LEATH]:  In all honestly, that's where the tuning up part had to be going on.
>
> [COHEN]:  Okay.
>
> [LEATH]:  You know I don't[] want to say it like that but yeah, they're so busy trying to–they're so busy trying to get at him.

(11/17/16 Telcon. Tr. at 2-3, emphasis added.)

At a November 18, 2016 conference before Judge Woods, Rhoden stated that he

knew Cohen and Leath had spoken and that "plaintiff should refrain from any further

communication . . . with Officer Leath until an answer has been put in and we determine whether

or not we will be representing him."  (Dkt. No. 61: 11/18/16 Conf. Tr. at 7.)  Cohen replied:

> Your Honor, he [Leath] called me.  I explicitly told him . . . that I am not his attorney, I represent Mr. Bacote.  I asked him if he was represented.  He said he was not represented.  I said that the Riverbay Corporation might represent you if you reach out to them.  I advised him of all of the things.

---

[1/]     Defendants agree that the revised conversation transcript quoted below "properly captures the substance of the recorded conversation between Lamont Leath and Gerald Cohen." (Cohen Aff. ¶ 13 n.1; see also Dkt. No. 124: Corchia Reply Aff. ¶¶ 37-38.)

> I made very clear to him that I'm only looking out for the interest of my
> client and not his.  And he wanted to speak to me.

(Id. at 7-8.)  Judge Woods stated that he was "not going to prohibit plaintiff from speaking with"

Leath, who might ultimately decline Riverbay's representation.  (Id. at 8-9.)  "If he declines your

representation," Judge Woods advised Riverbay's counsel, "I don't know that there is anything that

I can do to prevent him from doing so or from communicating with counsel for plaintiff."  (Id. at

8.)

At the November 18, 2016 court conference, Riverbay's counsel knew that Cohen and

Leath had spoken, but "defense counsel had not yet been informed of the date of that conversation,

or of the content of that conversation, or of the fact that Mr. Cohen had actually secretly recorded

that telephone conversation."  (Corchia Aff. ¶ 14, emphasis in original.)  On December 5, 2016,

Cohen emailed Rhoden a copy of the recording in response to Rhoden's discovery requests.

(Corchia Aff. Ex. K: 12/5/16 Email; Corchia Aff. ¶ 19; Dkt. No. 57: 12/9/16 Letter at 2; Cohen Aff.

¶¶ 27-29.)   Rhoden alleges that Cohen previously claimed there were no recordings of his

conversations with Leath (Corchia Aff. Ex. K: 12/6/16 Email; Def. Br. at 4), which Cohen denies

(Cohen Aff. ¶ 31).

On December 9, 2016, the parties wrote to Judge Woods because Rhoden refused to

produce Leath for a deposition "unless [Cohen] agreed in writing not to question Mr. Leath about

any conversations [Cohen] had with [Leath] that were not captured in the recording."  (12/9/16

Letter at 3.)  Cohen wrote:

> I recorded the conversation with Mr. Leath because I was concerned he might change
> his story at a deposition or trial.  Further, in an abundance of caution, since Mr. Leath
> was an unrepresented party, I wanted to maintain a recording of our conversation to
> ensure that there were no allegations that plaintiff's counsel pressured defendant
> Leath to make statements about this lawsuit.  It is not my usual practice to record
> conversations, this was an unusual situation where a named defendant insisted on

speaking with me about the incident despite having been advised the risks.

(Id. at 2 n.3.)  Cohen claimed, as he does here, that he "made no promises to Mr. Leath to induce him to speak with me," and that he only recalled Rhoden asking for written notes from the conversation, not the recording.  (Id. at 2 n.2, 4; see also Cohen Aff. ¶¶ 30-31.)  On receipt of Rhoden's "written request for all statements made by Mr. Leath," Cohen promptly disclosed the recording.  (12/9/16 Letter at 2.)

At a hearing on December 13, 2016, Judge Woods asked Cohen what basis he had to record his conversation with Leath.  (Dkt. No. 76: 12/13/16 Conf. Tr. at 8.)  Cohen claimed that he was concerned that Leath might change his testimony given the serious allegations, and that Cohen's actions fit within "a narrow exception under which an attorney can record a conversation" where there are allegations of "significant misconduct" or a potential for perjury.  (Id. at 9.)  Cohen further stated that he had reviewed a bar association ethics opinion that "overturned the general ban on attorneys recording witnesses."  (Id. at 9-10.)

Leath was deposed on December 16, 2016.  (Leath Dep. at 1.)  Leath testified that he intervened to secure Bacote's hands, as he told Cohen during their conversation.  (Id. at 33-34; see page 5 above.)  However, while Leath testified that the officers were "wrestling with Mr. Bacote" and "attempting to subdue him, restrain him" (Leath Dep. at 35), Leath believed the officers used an appropriate amount of force "to get [Bacote] handcuffed" (id. at 39-41).  Cohen provided Leath with a transcript of their November 17, 2016 conversation and played the recording.  (Id. at 80-81, 86-95.)  Leath admitted that it was his voice on the recording.  (Id. at 87, 95.)  Leath denied seeing other officers "tuning up" Bacote.  (Id. at 85-86.)  Leath testified that watching a videotape of the incident (after the call with Cohen) had refreshed his memory (id. at 60, 90-91), and that his comments on the call were taken out of context (id. at 91-92).  Leath further testified that when he

8

told Cohen the other officers were "busy trying to get at" Bacote (see page 5 above), he meant the officers were trying "[t]o subdue him" and he "didn't see any punches or kicks." (Leath Dep. at 92-93.)

## ANALYSIS

## I.   LEGAL STANDARDS

### A.   The Rules Of Professional Responsibility In Federal Court

"The federal courts enforce professional responsibility standards pursuant to their general supervisory authority over members of the bar." United States v. Hammad, 858 F.2d 834, 837 (2d Cir. 1988). State rules of professional conduct provide one reference point by which to gauge an attorney's conduct. See, e.g., In re Snyder, 472 U.S. 634, 645 n.6, 105 S. Ct. 2874, 2881 n.6 (1985) ("'The uniform first step for admission to any federal court is admission to a state court. The federal court is entitled to rely on the attorney's knowledge of the state code of professional conduct applicable in that state court . . . .'"); S.D.N.Y. Civ. R. 1.3(a) (Attorney seeking admission to practice in the Southern District must verify that he or she "has read and is familiar with . . . the New York State Rules of Professional Conduct"). However, a federal court's authority to sanction attorney misconduct is derived from its inherent power to ensure that attorneys exhibit ethical, professional behavior, not the rules of professional conduct themselves. See, e.g., In re Snyder, 472 U.S. at 645 n.6, 105 S. Ct. at 2881 n.6 ("The state code of professional responsibility does not by its own terms apply to sanctions in the federal courts. Federal courts admit and suspend attorneys as an exercise of their inherent power; the standards imposed are a matter of federal law.").[2]

---

[2]   Accord, e.g., United States v. Quest Diagnostics Inc., 734 F.3d 154, 163 (2d Cir. 2013); Grievance Comm. for S.D.N.Y. v. Simels, 48 F.3d 640, 646 (2d Cir. 1995) ("'[A] federal court is not bound by New York's view of what constitutes ethical professional conduct' . . .
(continued...)

Federal courts have the discretion to disqualify attorneys for ethical violations, "'derive[d] from their inherent power to preserve the integrity of the adversary process.'" United States v. Prevezon Holdings Ltd., 839 F.3d 227, 241 (2d Cir. 2016); accord, e.g., United States v. Quest Diagnostics Inc., 734 F.3d at 166 ("We have long recognized 'the power of trial judges to disqualify [attorneys] where necessary to preserve the integrity of the adversary process . . . .'"). "In exercising this power, the Court must 'be solicitous of a client's right freely to choose his counsel—a right which of course must be balanced against the need to maintain the highest standards of the profession.' Thus, disqualification is called for only where 'an attorney's conduct tends to taint the underlying trial,' because federal and state disciplinary mechanisms suffice for other ethical violations." United States v. Prevezon Holdings Ltd., 839 F.3d at 241 (citation omitted).[3/] Although courts deciding disqualification motions thus "often benefit from guidance offered by the American Bar Association . . . and state disciplinary rules, such rules merely provide general guidance and not every violation of a disciplinary rule will necessarily lead to disqualification." Hempstead Video,

---

[2/]    (...continued)
. [and] we are not bound by New York's (or any state court's) view of the Code" of Professional Responsibility.); Alexander Interactive, Inc. v. Adorama, Inc., 12 Civ. 6608, 2014 WL 2968528 at *2 (S.D.N.Y. June 26, 2014) ("Although federal courts do not generally enforce state bar disciplinary rules, they have the inherent power to address attorney misconduct that occurs during the course of litigation."); Zalewski v. Shelroc Homes, LLC, 856 F. Supp. 2d 426, 432 (N.D.N.Y. 2012) ("We must always remember that the standard of professional conduct in federal courts is a matter of federal law. . . . Accordingly, federal courts are guided, but not bound, by the State's Code of Professional Conduct . . . .").

[3/]    Accord, e.g., United States v. Quest Diagnostics Inc., 734 F.3d at 166 ("We are conscious that, notwithstanding any salutary effect on attorney ethics or the appearance of fairness, dismissal or disqualification for violations of ethical rules may impede the pursuit of meritorious litigation to the detriment of the justice system. Accordingly, courts must balance these competing concerns by limiting remedies for ethical violations to those necessary to avoid 'taint[ing] the underlying trial.'" (citation omitted)).

Inc. v. Inc. Vill. of Valley Stream, 409 F.3d 127, 132 (2d Cir. 2005) (citations omitted).[4]

       "[M]otions to disqualify are disfavored" in this Circuit.  See, e.g., Lankler, Siffert & Wohl LLP v. Rossi, 125 F. App'x 371, 371 (2d Cir. 2005) ("We have made it clear that motions to disqualify are disfavored.").[5]  The movant accordingly must satisfy "'a high standard of proof'" that disqualification of counsel is warranted.  Evans v. Artek Sys. Corp., 715 F.2d 788, 791 (2d Cir. 1983).[6]  Disqualification is committed to the court's discretion.  See, e.g., Muniz v. Re Spec Corp., 2017 WL 238482 at *3; Intellipayment, LLC v. Trimarco, No. 15-CV-1566, 2016 WL 1239261 at

---

[4]    Accord, e.g., GSI Commerce Sols., Inc. v. BabyCenter, L.L.C., 618 F.3d 204, 209 (2d Cir. 2010); Muniz v. Re Spec Corp., 16 Civ. 2878, 2017 WL 238482 at *3 (S.D.N.Y. Jan. 19, 2017).

[5]    Accord, e.g., Murray v. Metro. Life Ins. Co., 583 F.3d 173, 178 (2d Cir. 2009) ("'Because courts must guard against the tactical use of motions to disqualify counsel, they are subject to fairly strict scrutiny . . . .'"); Bd. of Educ. of City of N.Y. v. Nyquist, 590 F.2d 1241, 1246 (2d Cir. 1979) ("[W]e have shown considerable reluctance to disqualify attorneys despite misgivings about the attorney's conduct.  This reluctance probably derives from the fact that disqualification has an immediate adverse effect on the client by separating him from counsel of his choice, and that disqualification motions are often interposed for tactical reasons.  And even when made in the best of faith, such motions inevitably cause delay." (citations omitted)).

[6]    Accord, e.g., Hecklerco, LLC v. Yuuzoo Corp. Ltd., 15 Civ. 5779, 2016 WL 7742783 at *3 (S.D.N.Y. Dec. 16, 2016) ("Given the movant's heavy burden, as well as the severity of the sanction of disqualification and its impact on a litigant's right to the counsel of her choice, '[m]ere speculation' is not an adequate basis for a court to determine that an attorney's continued representation will undermine the integrity of the adversary process."); Rothberg v. Phil's Main Roofing, LLC, 14 Civ. 10195, 2016 WL 2344882 at *2 (S.D.N.Y. May 2, 2016) ("'[T]he appearance of impropriety alone does not warrant disqualification.'"); John Wiley & Sons, Inc. v. Book Dog Books, LLC, 126 F. Supp. 3d 413, 419 (S.D.N.Y. 2015) ("Disqualification is only warranted in the rare circumstance where an attorney's conduct poses a significant risk of trial taint." (quotations omitted)); Walsh v. Int'l Bhd. of Elec. Workers Local 503, 14 Civ. 1677, 2015 WL 5474231 at *6 (S.D.N.Y. Aug. 12, 2015) ("The party seeking disqualification must meet a 'heavy burden of proof in order to prevail.'").  Nevertheless, "any doubt is to be resolved in favor of disqualification."  Hull v. Celanese Corp., 513 F.2d 568, 571 (2d Cir. 1975); accord, e.g., Benevida Foods, LLC v. Advance Magazine Publishers Inc., 15 Civ. 2729, 2016 WL 3453342 at *10 (S.D.N.Y. June 15, 2016).

*4 (E.D.N.Y. Mar. 29, 2016).

Federal courts also have discretion to exclude evidence unethically obtained by attorneys.  See, e.g., United States v. Hammad, 858 F.2d at 842 ("[W]e reject the government's effort to remove suppression from the arsenal of remedies available to district judges confronted with ethical violations."); Cendant Corp. v. Bell, No. 99-CV-996, 2003 WL 1741767 at *1 (D. Conn. Mar. 31, 2003) ("[A] court has discretion to exclude evidence as a remedy for ethical violations when exclusion is justified.").  This discretion, however, is to be used "cautiously and with clear cognizance that suppression imposes a barrier between the finder of fact and the discovery of truth." United States v. Hammad, 858 F.2d at 842; accord, e.g., Scott v. Chipotle Mexican Grill, Inc., 12 Civ. 8333, 2014 WL 4852063 at *2 (S.D.N.Y. Sept. 29, 2014) (noting that the Second Circuit has "urged district courts to exercise this discretion cautiously"); Gidatex, S.r.L. v. Campaniello Imps., Ltd., 82 F. Supp. 2d 119, 126 (S.D.N.Y. 1999) ("[I]t must be noted that [the New York Rules of Professional Conduct] are disciplinary rules, not statutes.  The Second Circuit Court of Appeals has ruled that a court is not obligated to exclude evidence even if it finds that counsel obtained the evidence by violating ethical rules."); Miano v. AC & R Advert., Inc., 148 F.R.D. 68, 74 & 89-90 (S.D.N.Y.), R. & R. adopted, 834 F. Supp. 632 (S.D.N.Y. 1993).[7]

---

[7]    New York courts adhere to a similar rule.  See, e.g., Stagg v. N.Y.C. Health & Hosps. Corp., 162 A.D.2d 595, 596, 556 N.Y.S.2d 779, 780 (2d Dep't 1990) ("[E]ven if the matters to which the investigator testified were unethically obtained, they nevertheless would be admissible at trial.  New York follows the common-law rule that the admissibility of evidence is not affected by the means through which it is obtained.  Hence, absent some constitutional, statutory, or decisional authority mandating the suppression of otherwise valid evidence, such evidence will be admissible even if procured by unethical or unlawful means." (citation omitted)); Heimanson v. Farkas, 292 A.D.2d 421, 422, 738 N.Y.S.2d 894 (2d Dep't 2002) (same).

## II.   DEFENDANTS' MOTION TO DISQUALIFY PLAINTIFF'S COUNSEL AND/OR EXCLUDE THE RECORDING IS DENIED

Defendants argue that "the conduct of Mr. Cohen is violative of at least five of New York's Rules of Professional Conduct: Rule 3.7 (Lawyer as Witness); Rule 4.1 (Truthfulness in Statement to Others); Rule 4.2 (Communication With Person Represented By Counsel); Rule 4.3 (Communicating With Unrepresented Persons); and Rule 8.4(c) prohibiting a lawyer or law firm from 'engag[ing] in conduct involving dishonesty, fraud, deceit or misrepresentation.'"  (Dkt. No. 86: Def. Br. at 1.)

### A.   Rule 3.7

Rule 3.7 of the New York Rules of Professional Conduct states:

(a) A lawyer shall not act as advocate before a tribunal in a matter in which the lawyer is likely to be a witness on a significant issue of fact unless:

(1) the testimony relates solely to an uncontested issue;

(2) the testimony relates solely to the nature and value of legal services rendered in the matter;

(3) disqualification of the lawyer would work substantial hardship on the client;

(4) the testimony will relate solely to a matter of formality, and there is no reason to believe that substantial evidence will be offered in opposition to the testimony; or

(5) the testimony is authorized by the tribunal.

N.Y. R. Prof'l Conduct 3.7(a).

In addressing Rule 3.7, the Second Circuit held:

Rule 3.7 lends itself to opportunistic abuse.  "Because courts must guard against the tactical use of motions to disqualify counsel, they are subject to fairly strict scrutiny, particularly motions" under the witness-advocate rule.  The movant, therefore, "bears the burden of demonstrating specifically how and as to what issues in the case the prejudice may occur and that the likelihood of prejudice occurring [to the witness-advocate's client] is substantial."  "Prejudice" in this context means testimony that is "sufficiently adverse to the factual assertions or account of events

offered on behalf of the client, such that the bar or the client might have an interest in the lawyer's independence in discrediting that testimony."

Murray v. Metro. Life Ins. Co., 583 F.3d 173, 178 (2d Cir. 2009) (citations omitted).  Rule 3.7 addresses the risks that "(1) the lawyer might appear to vouch for his own credibility; (2) the lawyer's testimony might place opposing counsel in a difficult position when she has to cross-examine her lawyer-adversary and attempt to impeach his credibility; (3) some may fear that the testifying attorney is distorting the truth as a result of bias in favor of his client; and (4) when an individual assumes the role of advocate and witness both, the line between argument and evidence may be blurred, and the jury confused."  Id.

"'[D]isqualification may be required only when it is likely that the testimony to be given by [counsel] is necessary.'"  Purgess v. Sharrock, 33 F.3d 134, 144 (2d Cir. 1994); accord, e.g., Williams v. Rosenblatt Sec. Inc., 14 Civ. 4390, 2016 WL 590232 at *7 (S.D.N.Y. Feb. 11, 2016); Goodwine v. City of N.Y., 15 Civ. 2868, 2016 WL 379761 at *4 (S.D.N.Y. Jan. 29, 2016); Persh v. Petersen, 15 Civ. 1414, 2015 WL 5773566 at *3 (S.D.N.Y. Oct. 2, 2015) ("[N]o disqualification should occur until it is apparent the attorney's testimony is itself admissible and necessary because disqualification is highly prejudicial to the non-movant." (quotations omitted)).

Defendants argue that "[i]n personally recording the conversation, plaintiff's counsel converted himself to a potential witness in violation of Rule 3.7."  (Dkt. No. 86: Def. Br. at 11.)  Cohen's testimony, however, is not necessary in this case.  Leath does not deny that it is his voice on the tape or that he made the comments at issue on the recording.  (See page 7 above.)  Leath explained during his deposition that his comments about the officers "tuning up" Bacote were taken out of context and that, in any event, the videotape of the incident refreshed his recollection that none of the officers used excessive force.  (See id.)  Defendants further claim that "Cohen used

leading questions and tried to imply several times that officers of Riverbay Corporation struck and beat the plaintiff and to get Mr. Leath to agree with him." (Dkt. No. 85: Corchia Aff. ¶ 26.) These are credibility issues that do not require Cohen's testimony; the jury will be able to assess the weight and relevance of the recording based on the tape itself and Leath's trial testimony.   See, e.g., Hecklerco, LLC v. Yuuzoo Corp. Ltd., 15 Civ. 5779, 2016 WL 7742783 at *4 (S.D.N.Y. Dec. 16, 2016) ("Where an attorney's testimony would be cumulative or corroborative of that provided by other witnesses, the testimony cannot be said to be necessary, and disqualification is inappropriate.").[8/]   Cohen's testimony is not necessary to establish "a significant issue of fact" because Leath has authenticated the recording and can testify at trial concerning its content.   See, e.g., United States v. Tropeano, 252 F.3d 653, 661 (2d Cir. 2001); Paredes-Cordova v. United States, 03 Cr. 987, 2015 WL 1063048 at *4 (S.D.N.Y. Mar. 9, 2015); Mendez v. Int'l Food House Inc., 13 Civ. 2651, 2014 WL 4276418 at *1 (S.D.N.Y. Aug. 28, 2014); Fed. R. Evid. 901(b)(1), (5).

---

[8/]  The Court rejects defendants' claim that the recording "results in collateral issues involving what is missing on the recording, what was actually said during the conversation, whether the transcription is accurate, whether its source is trustworthy, how the audio file was created, whether it was edited . . . and will therefore require [Cohen] to be witness." (Corchia Aff. ¶ 27.)  Leath's admission that it is his voice on the tape moots much of defendants' argument.  (See page 7 above.)  Moreover, while Leath notes that "[t]he recording is incomplete" and that "the other two conversations that [he] had with Mr. Cohen are also missing," Leath does not claim that the missing portions of the tape impact his recorded statements, or that the "other two conversations" he had with Cohen otherwise are relevant. (Dkt. No. 85-15: 12/7/16 Leath Aff. ¶ 8.)  Finally, the dispute as to how the call transpired is not relevant for trial, despite its obvious significance to the present motion. Cohen's promise to dismiss Leath from the case allegedly induced Leath to speak to Cohen, not to embellish or fabricate his statements during the call.  (See 12/7/16 Leath Aff. ¶ 6.) Why or how the call took place has no bearing on the substance of the ensuing conversation. See, e.g., Miano v. AC & R Advert., Inc., 148 F.R.D. 68, 90 (S.D.N.Y.) ("There is little reason to believe that Miano's taping of the AC & R employees' conversations affected, in any way, the substance of what they said.  The information they provided was not the result of an attorney's overbearing behavior or superior skills."), R. & R. adopted, 834 F. Supp. 632 (S.D.N.Y. 1993).

### B.     Rule 4.1

Rule 4.1 states that "[i]n the course of representing a client, a lawyer shall not knowingly make a false statement of fact or law to a third person."  N.Y. R. Prof'l Conduct 4.1. "Misrepresentations can also occur by partially true but misleading statements or omissions that are the equivalent of affirmative false statements." N.Y. R. Prof'l Conduct 4.1, Cmt. 1.

Defendants argue that Cohen violated Rule 4.1 when he initially denied the recording existed, and later claimed that he did not know the conversation was being recorded.  (Dkt. No. 86: Def. Br. at 12; see also Dkt. No. 85: Corchia Aff. ¶¶ 18-19, 22.)  Cohen, however, denies these allegations (see page 7 above), and the exhibits cited by Rhoden do not contain an admission by Cohen to the contrary (see Corchia Aff. Exs. J-L).  Defendants have not met their burden of proving that Cohen "knowingly ma[d]e a false statement of fact or law to" Rhoden regarding the recording. Moreover, since the recording and transcript have been produced, any allegedly false statement is immaterial and certainly not sufficient to disqualify Cohen.

### C.     Rule 4.2

Rule 4.2 states: "In representing a client, a lawyer shall not communicate or cause another to communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the prior consent of the other lawyer or is authorized to do so by law."  N.Y. R. Prof'l Conduct 4.2(a).  This rule "applies even though the represented party initiates or consents to the communication." N.Y. R. Prof'l Conduct 4.2, Cmt. 3.  Rule 4.2(a) only applies where "the lawyer has actual knowledge of the fact of the representation; but such knowledge may be inferred from the circumstances.  Thus, the lawyer cannot evade the requirement of obtaining the consent of counsel by ignoring the obvious."  N.Y. R. Prof'l Conduct 4.2, Cmt. 8.

"In the case of a represented organization," Rule 4.2(a) "ordinarily prohibits communications with a constituent of the organization who: (i) supervises, directs or regularly consults with the organization's lawyer concerning the matter, (ii) has authority to obligate the organization with respect to the matter, or (iii) whose act or omission in connection with the matter may be imputed to the organization for purposes of civil or criminal liability."   N.Y. R. Prof'l Conduct 4.2, Cmt. 7.   However, "[c]onsent of the organization's lawyer is not required for communication with a former unrepresented constituent," although "[i]n communicating with a current or former constituent of an organization, a lawyer must not use methods of obtaining evidence that violate the legal rights of the organization."   Id.

Defendants acknowledge that Leath was unrepresented when he and Cohen spoke. (Dkt. No. 86: Def. Br. at 13; see also page 5 above.)   Nevertheless, defendants claim that Cohen should have known that Riverbay would represent Leath because "[t]here were numerous complaints filed in this action . . . and each time the newly added defendants were represented by the Armienti firm through their retention by Riverbay Corporation." (Def. Br. at 13.)   Without citing any legal authority to support their position, defendants argue that "[u]nder the unique circumstances of this case," Cohen should have treated Leath as "akin to being represented by counsel." (Id.)

The Court rejects defendants' argument.   In New York, "'ex parte interviews of an adversary's former employee are neither unethical nor legally prohibited.'"   Muriel Siebert & Co. v. Intuit Inc., 8 N.Y.3d 506, 511, 836 N.Y.S.2d 527, 529 (2007).[9/]   While "the right to conduct ex

---

[9/]     Accord, e.g., Muniz v. Re Spec Corp., 16 Civ. 02878, 2017 WL 238482 at *7 (S.D.N.Y. Jan. 19, 2017) ("'[P]arty' status applies only to current employees of corporate parties.   This is a bright-line test routinely applied by the federal courts sitting in New York." (citation omitted)); Indergit v. Rite Aid Corp., 08 Civ. 9361, 2016 WL 6441566 at *4 (S.D.N.Y. Oct. 31, 2016) ("Because Gauger and Jens are former employees, the second sentence of
(continued...)

parte interviews is [not] a license for adversary counsel to elicit privileged or confidential information from an opponent's former employee," defendants do not argue that Leath possessed any privileged information.  Muriel Siebert & Co. v. Intuit Inc., 8 N.Y.3d at 511-12, 836 N.Y.S.2d at 530.[10/]  Moreover, Riverbay's representation of Leath was not a foregone conclusion.  At the October 20, 2016 court conference the day before Leath was added as a defendant, Rhoden stated that he could not accept service on Leath's behalf, and at the November 18, 2016 conference after Cohen and Leath had spoken, Rhoden still had not yet determined whether he would be representing Leath.  (See pages 2, 5-6 above.)  Rule 4.2 does not prohibit an attorney from contacting a party who might (or might not) eventually decide to obtain counsel at some point in the future.  See, e.g., McHugh v. Fitzgerald, 280 A.D.2d 771, 772-73, 719 N.Y.S.2d 785, 786-87 (3d Dep't 2001) ("Nor do we accept defendant's contention that the [no contact] rule is operative inasmuch as the law firm knew that defendant was insured and should have anticipated that the insurance carrier would provide her with legal representation at some point in time.  The rule quite plainly proscribes communication when the lawyer knows the party to be represented by a lawyer in the matter. . . .

---

[9/]     (...continued)
Comment 7 to New York Rule of Professional Conduct 4.2 . . . demonstrate[s] that there is no limitation on collective counsel's contacting Jens and Gauger directly . . . ."); Arista Records LLC v. Lime Grp. LLC, 784 F. Supp. 2d 398, 416 (S.D.N.Y. 2011); Judd v. Take-Two Interactive Software, Inc., 07 Civ. 7932, 2008 WL 906076 at *1 (S.D.N.Y. Apr. 3, 2008) ("As a general rule, a party cannot prevent an adverse party from conducting ex parte interviews with its former employees.") (Lynch, D.J.).

[10/]    Muriel Siebert was decided under the Code of Professional Responsibility, which has since been repealed and replaced by the New York Rules of Professional Conduct.  However, the prior version of Rule 4.2 was substantively identical to the current provision.  See Muriel Siebert & Co. v. Intuit Inc., 8 N.Y.3d at 511 n.1, 836 N.Y.S.2d at 529 n.1; In re Amgen Inc., No. 10-MC-0249, 2011 WL 2442047 at *9 n.15 (E.D.N.Y. Apr. 6, 2011) ("New York did not intend to effect any substantive change in the no-contact rule in amending and re-numbering it in 2009."), R. & R. adopted, 2011 WL 2418815 (E.D.N.Y. June 14, 2011).

[E]ven utilizing . . . an objective criteria, i.e., the attorney knew or should have reasonably known of the adverse representation, a violation of the rule will, nonetheless, only occur where the party was in fact represented at the time of the communication.").  Judge Woods stated as much when he declined to prevent Cohen from speaking with Leath while he remained unrepresented, and Leath informed Cohen prior to their conversation that he "s[aw] no need for representation at this time." (See page 4 above.)  Defendants have not established that Cohen violated Rule 4.2 by communicating with former employee Leath.[11]

### D.   Rule 4.3

Rule 4.3 states:

> In communicating on behalf of a client with a person who is not represented by counsel, a lawyer shall not state or imply that the lawyer is disinterested.  When the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the matter, the lawyer shall make reasonable efforts to correct the misunderstanding.  The lawyer shall not give legal advice to an unrepresented person other than the advice to secure counsel if the lawyer knows or

---

[11]   Some courts interpreting other states' version of Rule 4.2 have held that the prohibition on communications with constituents "whose act or omission in connection with the matter may be imputed to the organization for purposes of civil or criminal liability" (see page 16 above) extends to former employees.  See, e.g., Thurston v. Okemo Liab. Co., 123 F. Supp. 3d 513, 515 (D. Vt. 2015) (citing cases, but rejecting such an interpretation); Dubois v. Gradco Sys., Inc., 136 F.R.D. 341, 345 (D. Conn. 1991) (Cabranes, D.J.) (same); Polycast Tech. Corp. v. Uniroyal, Inc., 129 F.R.D. 621, 626 (S.D.N.Y. 1990) (same).  New York's version of Rule 4.2, however, expressly states that "[c]onsent of the organization's lawyer is not required for communication with a former unrepresented constituent." (See page 16 above.)  For this reason, along with the persuasive arguments contained in Thurston, Dubois and Polycast, the Court finds that Rule 4.2 does not prohibit ex parte communications with former employees, even if the former employee's actions while employed could be imputed to the organizational defendant.  See, e.g., Polycast Tech. Corp. v. Uniroyal, Inc., 129 F.R.D. at 628 ("The corporation's interest in counseling a former employee whose acts may lead to imputed liability is likewise an insufficient basis for extending the definition of 'party' to such persons.  While such a participant's statements to opposing counsel may be damaging to the corporation, they are no more so than the statements of a former employee who merely witnessed the liability-creating acts but did not commit them.  Yet there is no dispute that the opposing attorney may interview the latter witness freely.").

> reasonably should know that the interests of such person are or have a reasonable
> possibility of being in conflict with the interests of the client.

N.Y. R. Prof'l Conduct 4.3.

Before the conversation at issue took place, Cohen emailed Leath informing him that

"our interests are directly adverse and I cannot speak to you if you are represented by an attorney."

(See page 4 above.)  Cohen also stated: "I feel compelled to inform you that I am only looking out

for the best interest of my client, Orrin Bacote."  (See id.)  Leath responded:

> I do understand as you've explained on the phone that you are representing Mr.
> Bacote the plaintiff . . . in this matter and that [h]e is your sole interest[.]  In addition
> as I see no need for representation at this time as I expect to be removed from this
> action, I've agreed to speak freely with you as I have caused no harm to your client
> and he has acknowledged as such.

(See id.)  Cohen did not suggest that he was disinterested, and indeed told Leath that he represented

Bacote and that their interests were "directly adverse."  See N.Y. R. Prof'l Conduct 4.3, Cmt. 1 ("In

order to avoid a misunderstanding, a lawyer will typically need to identify the lawyer's client and,

where necessary, explain that the client has interests opposed to those of the unrepresented person.").

Leath confirmed that he understood that Bacote was Cohen's "sole interest."  (See also Dkt. No. 85:

Corchia Aff. Ex. M: Leath Dep. at 65-66.)  Cohen complied with Rule 4.3 before speaking with

Leath, who was not confused as to Cohen's role in this litigation.[12]

---

[12]     Defendants argue that Cohen was required to advise Leath to secure counsel under Rule 4.3.
The rule on its face does not impose such a rigid requirement, and defendants cite no other
authority to support their position.  See, e.g., Colburn Family Found. v. Chabad's Children
of Chernobyl, 739 F. Supp. 2d 614, 623 (S.D.N.Y. 2010) ("While a lawyer may advise an
unrepresented adverse party to secure counsel, there is no requirement that the lawyer must
provide such advice."); N.Y.C. Bar Ass'n, Ethical Duties Concerning Self-represented
Persons, Op. 2009-02, 2009 WL 399765 at *4 & n.6 (2009) ("[A] lawyer may, but need not,
advise a self-represented party to retain counsel and identify the legal issues that could be
usefully addressed by counsel. . . .  [W]e acknowledge that there may be situations where
a lawyer should not advise a nonclient to seek counsel.  Indeed, we conclude that a lawyer
(continued...)

### E.    Rule 8.4(c)

Rule 8.4(c) states that "[a] lawyer or law firm shall not . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation."   N.Y. R. Prof'l Conduct 8.4(c). Defendants argue that Cohen violated Rule 8.4(c) when he allegedly promised to dismiss Leath from the case if Leath provided a statement, and when he surreptitiously recorded that statement.  (Dkt. No. 86: Def. Br. at 6-7.)

#### 1.    The Alleged Promise To Dismiss Leath

Cohen claims that "Leath was eager to speak with me because he was convinced that the case would be dismissed against him once I heard what he had to say."  (See page 3 above.) Bacote furthermore told Leath (apparently without Cohen's knowledge) to call Cohen "to [be] removed from the case."  (See page 3 above.)  Cohen asked Leath at his deposition why he believed he would be dismissed as a defendant:

> Q.    Before I sent you this e-mail . . . did we discuss at all about making a statement or removing you from the case or anything like that?
>
> A.    In your words, no.
>
> . . . .
>
> Q.    You made the assumption because you spoke to Mr. Bacote?

---

12/    (...continued)
is obligated to render such advice only where it is in the interest of the lawyer's client to do so, or the self-represented person has demonstrated confusion about the lawyer's role."); N.Y.S. Bar Ass'n Comm. on Prof'l Ethics, Op. 728, 2000 WL 1692766 at *5 (2000) (finding under a prior, similarly worded version of Rule 4.3 that "there is nothing in the disciplinary rules that explicitly requires the municipality's attorney to advise the unrepresented claimant about the need for a lawyer or the risk of self-incrimination").  Moreover, Leath admits that Cohen "informed [him] that [he] was entitled to have an attorney in this case" (Dkt. No. 85-15: 12/7/16 Leath Aff. ¶ 4), but Leath "s[aw] no need for representation" (see page 4 above). Whether Leath did not believe he needed representation because of Cohen's promises before their recorded conversation is addressed below in the context of Rule 8.4(c).

A.    Yes.

Q.    But it wasn't because you spoke to me about that; right?

A.    No.

(Dkt. No. 85: Corchia Aff. Ex. M: Leath Dep. at 67-68.)

Elsewhere in his deposition, however, Leath maintains that Cohen promised to dismiss him in exchange for a statement.  (Leath Dep. at 63-64, 69, 77.)  Cohen stated the following during the recorded phone call after he and Leath discussed Bacote's assault:

> [COHEN]: Anyway, alright so, I mean I guess I could, what I could do, if you don't want to like inv–  get in–, I got to talk to my partner and see what we can do.  We can just issue you a subpoena to come testify.
>
> [LEATH]: Yeah I don't care.
>
> [COHEN]: And then, and then once you issued your subpoena then you could um you could come and then if your testimony is what it is like now, I'll just I'll–  I'll, you know, basically withdraw.  I'll talk to Bacote, but I'll withdraw you from the complaint.  You know?
>
> [LEATH]: Yeah, yeah.
>
> . . . .
>
> [COHEN]: Yeah, 'cause I only added you because this whole, this whole, you know Orrin [Bacote] said he got tuned up at the van, I don't know.  You know that's the one thing that's different between you and him.

(Dkt. No. 116: Cohen Aff. Ex. M: 11/17/16 Telcon. Tr. at 11, emphasis added.)  Bacote's initial conversation with Leath, as well as Cohen's statements during the recorded call, may have caused confusion; but there is no clear evidence that Cohen made any false promises to Leath before or during their conversation to induce him to speak, Leath's statements to the contrary

notwithstanding.[13]

## 2.   Cohen's Recording Of The Call With Leath

It is not illegal in New York for a person to secretly record a conversation with another.  P.L. § 250.00, 250.05.  Whether the practice is unethical for an attorney is a different question.  Three New York bar associations and the American Bar Association have issued ethics opinions that address surreptitious recordings by counsel, with differing conclusions.  See N.Y.C. Bar Ass'n, Undisclosed Taping of Conversations by Lawyers, Op. 2003-02, 2004 WL 837933 at *5 (2004) (recordings prohibited unless "lawyer has a reasonable basis for believing that disclosure of the taping would significantly impair pursuit of a generally accepted societal good"); American Bar Ass'n, Electronic Recordings by Lawyers Without the Knowledge of All Participants, Op. 01-422 (2001) (generally permitting recordings provided counsel does not violate any specific ethical rule in the process); N.Y. Cty. Lawyers' Ass'n. Comm. on Prof'l Ethics, Secret Recording of Tel. Conversations, Op. 696, 1993 WL 837936 at *2-3 (1993) (same); N.Y.S. Bar Ass'n Comm. on Prof'l Ethics, Op. 328 (1974), http://www.nysba.org/CustomTemplates/Content.aspx?id=7924 (prohibiting recordings absent "extraordinary circumstances").

These conflicting opinions leave attorneys' potential disciplinary exposure, if any, less than clear.[14]   Secretly taping a conversation with an unrepresented party is hardly a

---

[13]      Indeed, in the taped conversation, Cohen said that if Leath's deposition testimony was like in the call, Cohen would talk to his partners and Bacote about dismissing Leath from the case.  But since Leath's testimony differed at deposition, at least as to "tuning up" Bacote, Cohen was not obligated to even talk to Bacote about dismissing Leath from the case, much less actually dismiss Leath from the case.

[14]      See, e.g., John B. Harris, Masking Tapes: An Analysis of the Law of Secret Recording in New York, N.Y. LEGAL ETHICS REPORTER (March 21, 2016), http://www.newyorklegal ethics.com/masking-tapes-an-analysis-of-the-law-of-secret-recording-in-new-york/ ("One (continued...)

praiseworthy practice. But the Court cannot conclude that creating a non-consensual recording is

in and of itself an ethical violation, particularly where the ABA and one New York area bar

association allow such recording.[15]  Even if it were an ethical breach, it does not follow that

---

[14]  (...continued)

may infer from the existence of contradictory ethics opinions in New York that a disciplinary prosecutor would have trouble demonstrating that secret taping unaccompanied by other misrepresentation is per se deceitful."); compare Mena v. Key Food Stores Co-op., Inc., 195 Misc. 2d 402, 404-05, 758 N.Y.S.2d 246, 248 (Sup. Ct. Kings Cty. 2003) ("Contemporary ethical opinions hold that a lawyer may secretly record telephone conversations with third parties without violating ethical strictures so long as the law of the jurisdiction permits such conduct." (citing ABA Op. 01-422)), with Alexander Interactive, Inc. v. Adorama, Inc., 12 Civ. 6608, 2014 WL 2968528 at *3 (S.D.N.Y. June 26, 2014) ("Had [plaintiff's counsel] made a tape recording of her conversation with the defendants' expert without disclosing that she was doing so, she would likely have violated Rule 8.4(c) of the New York Rules of Professional Conduct, which prohibits 'conduct involving dishonesty, fraud, deceit or misrepresentation.'" (citing N.Y.C. Bar Ass'n Op. 2003-02)); Miano v. AC & R Advert., Inc., 148 F.R.D. 68, 75-76 (S.D.N.Y.) ("Although in many states, including New York, it is not illegal for one party to a conversation to record the conversation without the other party's knowledge or consent, there is authority for the proposition that it is unethical for an attorney to do so, since such conduct is considered to involve deceit or misrepresentation." (citing N.Y.S. Bar Ass'n Comm. on Prof'l Ethics Op. 328)), R. & R. adopted, 834 F. Supp. 632 (S.D.N.Y. 1993).

[15]  Indeed, Cohen argues that his conduct was not expressly prohibited by the New York City Bar Association's Opinion 2003-02 on which defendants rely.  (Dkt. No. 114: Cohen Br. at 8-9; see Dkt. No. 86: Def. Br. at 6-10.)  Opinion 2003-02 states that it may be permissible to record a conversation "[i]n situations involving the investigation of ongoing criminal conduct or other significant misconduct."  N.Y.C. Bar Ass'n, Undisclosed Taping of Conversations by Lawyers, Op. 2003-02, 2004 WL 837933 at *5.  Leath allegedly physically assaulted Bacote while handcuffed, and/or failed to intervene while his fellow officers did so.  (See pages 1-2 above; Cohen Br. at 8.)  "These allegations, if true, would not only expose Mr. Leath to civil liability in this case, but could also subject him to criminal prosecution."  (Cohen Br. at 8.)  The Court agrees with Cohen that his actions conceivably could fall under the exception for attorneys investigating "significant misconduct."  (Id.)  And, "even if a disciplinary body does not necessarily share an attorney's assessment of the need for undisclosed taping in a particular set of circumstances, there is little likelihood of, and no need for, the imposition of sanctions as long as the attorney had a reasonable basis for believing that the surrounding circumstances warranted undisclosed taping."  N.Y.C. Bar Ass'n, Undisclosed Taping of Conversations by Lawyers, Op. 2003-02, 2004 WL 837933 at *3.

exclusion would be the appropriate remedy here.  See, e.g., Miano v. AC & R Advert., Inc., 148

F.R.D. at 89-90 ("[E]ven if [the] taping activity could be attributed to [plaintiff's counsel], it is not

at all clear that suppression of the tapes as evidence would be an appropriate remedy. . . .  [T]he

[Second Circuit] Court of Appeals recognized that a court's discretion to suppress evidence should

be exercised cautiously. . . .   The purpose of the [no contact] rule is to protect a party from the

superior knowledge and skill of an attorney in securing uncounseled statements and attorney-client

confidences.  The interests served by the rule against clandestine taping are different.  Its primary

concern is with an attorney's status as a member of the bar and expectations of conduct in dealing

with others that flow from that status, i.e., candor and honesty.  While no less important, these

interests are more appropriately monitored and enforced through disciplinary bodies rather than trial

courts." (fn. omitted)).  Therefore, because defendants have not clearly shown that the recording was

made in violation of the Rules of Professional Conduct or any other ethical precept, the Court

declines to exclude it.

### F.      Cohen's Conduct As A Whole

As a final matter, the Court must determine whether Cohen's conduct as a whole

warrants disqualification.  The Court is mindful that its role in this dispute is not as an ad hoc

grievance committee.  See, e.g., United States v. Prevezon Holdings Ltd., 839 F.3d 227, 241 (2d Cir.

2016) ("[D]isqualification is called for only where 'an attorney's conduct tends to taint the

underlying trial,' because federal and state disciplinary mechanisms suffice for other ethical

violations."); W. T. Grant Co. v. Haines, 531 F.2d 671, 677 (2d Cir. 1976) ("The business of the

court is to dispose of litigation and not to act as a general overseer of the ethics of those who practice

here unless the questioned behavior taints the trial of the cause before it.").  There is no indication

that Cohen violated the Rules of Professional Conduct or otherwise "taint[ed] the underlying trial,"

including the pre-trial process.[16/]

Even had Cohen violated the ethical rules (which he did not), disqualifying him would deprive Bacote of his chosen counsel at a critical point in this litigation when discovery has closed and defendants intend to move for summary judgment. (See Dkt. No. 117); see also, e.g., Bd. of Educ. of City of N.Y. v. Nyquist, 590 F.2d 1241, 1246 (2d Cir. 1979) ("[D]isqualification has an immediate adverse effect on the client by separating him from counsel of his choice, and . . . even when made in the best of faith, such motions inevitably cause delay. . . .  [C]ourts should be quite hesitant to disqualify an attorney."). Cohen "has taken nearly every defendant deposition in this case and has been lead counsel at every hearing, has been instrumentally involved with the discovery . . . and will be opposing defendants' . . . summary judgment motion." (Dkt. No. 114: Cohen Br. at 18 n.11.) Disqualifying Bacote's lead litigation counsel not only is unwarranted on this record but in any event would be highly prejudicial to Bacote. The Court declines, in its discretion, to disqualify Cohen.

---

[16/] Defendants argue in passing that Cohen tainted the trial when he told Leath that "[t]he Riverbay lawyer is not giving me any information, he wouldn't even give me– like any information about who did what . . . ." (Dkt. No. 116: Cohen Aff. Ex. M: 11/17/16 Telcon. Tr. at 13; Dkt. No. 86: Def. Br. at 14-15.)  Defendants claim that Cohen improperly "intimat[ed] [that Riverbay's counsel] the Armienti firm had withheld information from plaintiff's counsel which had the potential of affecting attorney-client relations." (Def. Br. at 15.)  At the time of this conversation, however, there was no attorney client relationship between Leath and Riverbay's counsel.  (See pages 4-6 above.)  Defendants' argument that Cohen's comments "had the potential" to damage the future attorney-client relationship is pure speculation.  In any event, whether accurate or not, Cohen's statement that Riverbay's counsel refused to provide him with any information is not the kind of disparagement that could have "upset the equilibrium of the relationship between" Leath and his counsel. Papanicolaou v. Chase Manhattan Bank, N.A., 720 F. Supp. 1080, 1087 (S.D.N.Y. 1989); see also Def. Br. at 14-15 (citing Papanicolaou in support).

26

## **CONCLUSION**

For the reasons set forth above, defendants' motion (Dkt. No. 84) to disqualify Cohen as Bacote's counsel, and/or to exclude the recorded conversation between Cohen and Leath, is DENIED.

SO ORDERED.

Dated:      New York, New York
            March 10, 2017

_____
**Andrew J. Peck**
United States Magistrate Judge


Copies ECF to:      All Counsel
                    Judge Woods